**IT IS ORDERED as set forth below:**



**Date: January 24, 2024**

_____

**Barbara Ellis-Monro
U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| IN RE: | CASE NO. 23-51937-BEM |
| BRYAN MICHAEL WLODAR, | |
| Debtor. | CHAPTER 7 |

### O R D E R

This matter came before the Court on December 7, 2023, for an evidentiary hearing on the United States Trustee's *Motion to Dismiss Based on Presumption of Abuse Arising Under 11 U.S.C. §707(b)(2) and Abuse Arising Under 11 U.S.C. §707(b)(3)* (the "Motion"). [Doc. 25]. Lindsay P.S. Kolba appeared on behalf of the United States Trustee ("UST") and Robert D. Schwartz appeared on behalf of Debtor. The Court heard testimony from Donovon Slack ("Mr. Slack") and Bryan Michael Wlodar ("Debtor") and admitted documentary exhibits UST Exhibits 1-5, 6, 8 and 9 (hereinafter UST Ex. #). Based upon the documentary and testimonial evidence

presented and after consideration of the argument of counsel and applicable authorities, the Court makes the following Findings of Fact and Conclusions of Law.[1]

## I. Findings of Fact

Debtor filed this case on February 28, 2023. Debtor testified that the filing was caused by his divorce case that caused him to incur substantial attorney's fees that he could not sustain while having sufficient funds to pay his monthly living expenses; indeed, Debtor was borrowing money monthly from family to pay for a place to live. Debtor testified that he intended to pay his legal fees after the division of property he would receive in the divorce case but, after 4 years and a 3- or 4-day trial, Debtor was advised to settle the case in order to preserve his ability to see his son. Thus, Debtor settled the divorce case by agreeing to accept $50,000 from his former spouse in exchange for being able to see his young son every other weekend and for the equity in the marital residence. Debtor received the $50,000 prior to filing this case but did not quit claim his interest in the house to his ex-wife until after the case was filed, and his ex-wife did not remove him from the mortgage obligation until after the filing.

Debtor testified that of the $50,000 settlement he immediately paid $28,000 to the chapter 7 Trustee and then turned over additional funds after the Court ruled against him on his claimed exemption, so that he was left with $8,000. He used those funds to buy Christmas presents and put $7,000 in savings. Debtor recently had to get braces as he has rheumatoid arthritis which is causing issues with his teeth. Debtor also pays for bi-monthly injections for his arthritis that cost him between $1,800 and $2,000.

---

[1] To the extent, if any, that the Findings of Fact as stated may be deemed Conclusions of Law, they shall be considered Conclusions of Law. Similarly, to the extent the matters expressed as Conclusions of Law may be deemed Findings of Fact, they shall be considered Findings of Fact.

Debtor is employed at Cox Automotive as a Product Owner providing solutions to complex technical parts issues. Debtor works with remote technicians who work on vehicles. Many of these calls are from outside Georgia and from as far away as India. Debtor generally works from home and requires high speed internet for his job. In 2022, Debtor made $142,486.27. [UST Ex. 6]. Debtor anticipates he will make the same plus a yearly raise of approximately three percent (3%) in 2023.

Debtor lives in an apartment that is close to his son's school and events. Monthly rent for this apartment is $2,300. Debtor testified that his rent has increased from $1,600 per month to $2,300 per month in four years. Debtor also stated that he looked for other apartments but rent in Atlanta is very expensive and he values living in close proximity to his son. Debtor has visitation with his son every other weekend but sees his son almost every day because he is a coach for his son's sports, goes to his son's karate class to watch and is very active with his son in Boy Scouts. Debtor purchased a travel trailer in 2021 for $30,000 to use for camping with his son. Debtor pays $330 per month for the trailer and the obligation is current. Debtor testified that the trailer saves money because he does not have to incur lodging costs when traveling with his son. When Debtor and his son are not camping or fishing, they spend time going to movies, playing video games and reading. Debtor testified further that he buys clothing, video games, books and fishing and camping gear from Amazon. Debtor's son was 6 years old when the divorce proceeding began and is now 11 years old.

The UST's analyst, Mr. Slack, testified that he was the analyst assigned to this case. Mr. Slack reviewed all documents received from Debtor's attorney including pay advices, bank statements, medical expenses, Debtor's Venmo account, divorce decree and settlement and Debtor's son's expenses. In analyzing whether the presumption of abuse arises in this case, Mr.

3

Slack reviewed Debtor's pay advices from August 1, 2022 through January 31, 2023 to determine Debtor's net income and then reviewed Debtor's expenditures and disallowed those the UST argues are not allowable. Mr. Slack created a comparison chart for each of Debtor's Schedule I (Income) and J (Expenses) and the I and J proposed by the UST. [UST Ex. 9]. Mr. Slack used the same methodology to review Debtor's Means Test and to create a comparison between the Means Test filed by Debtor and the UST's proposed Means Test. [UST. Ex. 8].

In the UST's Means Test, Mr. Slack increased the household size to 2 because Debtor shares custody of his son and took the deductions from Debtor's pay advices to populate the Means Test with the exception of the child life insurance deduction which was not included in the Means Test. The difference in the deductions claimed by Debtor and those included in the UST's analysis is $516.29. This difference is comprised of the UST's disallowance of Debtor's rent allowance, slight differences in the amounts allowed for secured debt payments that is, the UST used the amounts reflected in Debtor's bank statement and deposition testimony of what he paid on the travel trailer rather than that claimed in the Means Test, and a slight decrease in payroll deductions amounting to a $23.57 difference. By the UST's calculation in the Means Test, Debtor has $556.02 available per month to fund a chapter 13 plan. Debtor's Means Test calculation shows $39.70 per month in disposable income. Mr. Slack testified that he disallowed the rent amount in the Means Test because Debtor also claimed a secured creditor payment for the marital residence, and Debtor could not claim both expenses—he had to take one or the other, and the UST used the larger, secured payment deduction.

In comparing Debtor's Schedules I and J, the UST included a bonus from Debtor's employer and the $50,000 settlement less the amounts turned over to the chapter 7 Trustee in calculating Debtor's monthly income resulting in an increase from Debtor's filed schedules of

4

$1,290.47. The UST also reduced the amount of rent claimed on Schedule J to the IRS Local/National Standards (the "IRS Standards") for a 2-person household, increased the amount that Debtor claimed for utilities based on the IRS Standards, and disallowed the expenses for: (i) telephone, cell, internet, satellite, cable because that is included in the IRS Standards, (ii) entertainment because it was not confirmed by bank statements, that is, Mr. Slack did not know what was purchased at Walmart and Amazon, (iii) the travel trailer as not reasonably necessary, and (iv) the attorney's fee (for Debtor's counsel in this case) because those would be paid through the plan. These adjustments result in a difference of $1,113 in deductions on Schedule J. Combining the additional income and the reduced expenses results in the UST arguing that Debtor has $2,455.23 per month in disposable income sufficient to fund a chapter 13 plan that would pay all creditors in full over 60 months.

**II. Legal Standards**

In cases filed under chapter 7 of the Bankruptcy Code, "the Means Test serves as a 'screening mechanism to determine whether a Chapter 7 proceeding is appropriate.'" *In re Rivers*, 466 B.R. 558, 560 (Bankr. M.D. Fla. 2012) (quoting *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 65 n.1, 131 S. Ct. 716, 722 n.1 (2011)). The Means Test was added to the Code when Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA) to address perceived abuses of the bankruptcy system. *In re Norwood-Hill*, 403 B.R. 905, 907-08 (Bankr. M.D. Fla. 2009). One such change is reflected in 11 U.S.C. § 707(b), which states that the court "may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts ... if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). Section 707(b)(2) creates a presumption of abuse "if the debtor runs afoul of the so-called '[M]eans [T]est.'" *In re Witcher*, 702 F.3d 619, 621 (11th Cir.

5

2012). "If a presumption of abuse arises under the [M]eans [T]est and is not rebutted, the court may dismiss or convert the chapter 7 case." *Id*. (citing 11 U.S.C. §§ 707(b)(1), 707(b)(2)).

The Means Test provides a rote, mathematical calculation to guide courts' analyses on whether a chapter 7 filing is presumed abusive. *Townson v. Ruff (In re Ruff)*, 639 B.R. 772, 777 (Bankr. N.D. Ga. 2022) (Bonapfel, J.). Specifically, "the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of . . . 25 percent of the debtor's nonpriority unsecured claims in the case, or $9,075 whichever is greater; or . . .$15,250.." 11 U.S.C. § 707(b)(2)(A)(i)(I)-(II). In other words, a chapter 7 filing is presumed to be abusive if the debtor's finances mechanically reflect an ability to fund a repayment plan to his or her creditors. *In re Thompson,* 457 B.R. 872, 875 (Bankr. M.D. Fla. 2011) ("A Chapter 7 filing is presumed abusive if there is disposable income . . . to fund a sixty-month plan[.]").

Debtors are permitted to deduct certain expenses in their calculations, but only at the amount sanctioned by the IRS Standards.

> In calculating whether the presumption of abuse arises, debtors may deduct housing expenses in the amounts specified in the IRS' National/Local Standards. If a debtor's actual expenses are less than the amount specified by the IRS, then the debtor gets a break. If his expenses are greater than the specified IRS amount, on the other hand, the debtor must nevertheless use the IRS figures. This was the ruling in *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 131 S. Ct. 716, 178 L. Ed. 2d 603 (2011), where the Supreme Court held that, under § 707(b)(2)(A)(ii), 'applicable' expenses of the National Standards and the Local Standards are limited by the amounts specified therein[.]

*In re Bartlett*, No. 21-11289, 2023 Bankr. LEXIS 149, *10-11 (Bankr. D.N.M. Jan. 20, 2023) (disallowing the additional rent in the debtor's Means Test calculation). The IRS Standards include an amount for housing and utilities that has been allocated into two categories: (1) insurance and operating expenses; and (2) mortgage or rent expenses. The Means Test also specifically allows

6

debtors to deduct payments on secured debts under § 707(b)(2)(A)(iii) from their current monthly income ("CMI").[2] *In re Walker*, No. 05-15010, 2006 Bankr. LEXIS 845, at *5 (Bankr. N.D. Ga. 2006) (Drake, J.).

Importantly, bankruptcy courts in the Eleventh Circuit have treated the Means Test as a mechanical, bright-line rule by taking a "'snapshot' of the debtor's finances as of the petition date and [not factoring] into consideration a debtor's future intentions." *In re Henderson,* No. 23-50381, 2023 Bankr. LEXIS 2377, at *11 (Bankr. N.D. Ga. Sept. 27, 2023) (Ellis-Monro, J.); *see also Norwood-Hill*, 403 B.R. at 909; *In re Lee*, 640 B.R. 943, 947-48 (Bankr. M.D. Ga. 2022) (the "snapshot" interpretation is the appropriate approach under § 707(b)(2)); *In re Benedetti*, 372 B.R. 90, 96-97 (Bankr. S.D. Fla. 2007) ("a 'snapshot' view of the Debtor's expenses on the date of filing makes sense in the context of a Chapter 7 case"). The snapshot approach allows debtors to include payments that are contractually due at the time of the petition in their Means Test calculations even if the debtor intends to abandon those payments or surrender that property in the future. *See e.g. In re Walker*, 2006 Bankr. LEXIS 845, at *10-11.

A presumption of abuse can be rebutted by a demonstration of "special circumstances" such as a serious medical condition or active-duty military service, which justify "additional expenses or adjustments to current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i). Debtor has the burden of establishing special circumstances through documentation and explanation of the special circumstances. *Id.* § 707(b)(2)(B)(ii)-(iii). Before the Court need consider special circumstances, the UST as the moving party, must carry the initial burden of demonstrating by a preponderance of the evidence that there is a presumption of abuse under § 707(b)(2) and that Debtor's chapter 7 filing should be

---

[2] *See* 11 U.S.C. §§ 101(10(A); 707(b)(2)(A)(i) & (iii). There is no "double dipping" when the debtor's residence is subject to a mortgage, because the mortgage expense is reduced by the amount of secured debt deduction.

7

dismissed. *Sturm v. U.S. Tr.*, 455 B.R. 130, 139 (N.D. Ohio 2011) (citing *In re Wright*, 364 B.R. 640, 643 (Bankr. N.D. Ohio 2007)).

The Means Test is an objective and mechanical approach that streamlines a finding of abuse by creating two paths: the debtor fails the Means Test and the filing is presumed to be abusive, or the debtor passes the Means Test and a presumption of abuse does not arise. Passing the Means Test, however, does not foreclose a finding of abuse—rather, under § 707(b)(3), the Court may still find a filing to be abusive after considering the "totality of the circumstances." 11 U.S.C. § 707(b)(3)(B). "[I]f the presumption does not arise or a debtor rebuts it, a court must still determine whether a case is abusive under section 707(b)(3). In particular, a court 'shall consider' whether the case was filed in 'bad faith' or whether 'the totality of the circumstances of the debtor's financial situation…demonstrates abuse.'" *In re Altman*, No. 09-70328, 2009 Bankr. LEXIS 4185, at *21 (Bankr. M.D. Ga. Dec. 18, 2009) (citing 11 U.S.C. § 707(b)(3)(A) and (B)).

Unlike the Means Test, the "totality of the circumstances" approach is less mechanical and more forward-looking. *In re Cribbs*, 387 B.R. 324, 332 (Bankr. S.D. Ga. 2008) (detailing a myriad of factors to consider). Specifically, this approach considers the debtor's ability to pay as of the date of the hearing on the motion to dismiss rather than on the petition date that the Means Test uses. *In re Henebury,* 361 BR 595, 609 (Bankr. S.D. Fla. 2007). In addition, "future or foreseeable events may be considered" including events that would create some kind of surplus in the debtor's budget to then be able to fund a chapter 13 plan. *In re Cribbs*, 387 B.R. at 332.

> Moreover, applying § 707(b)(3), courts regularly have dismissed cases (or permitted debtors to convert them to Chapter 13) based on a debtor's ability to fund a Chapter 13 plan. Courts have done so even where the genesis of the debtors' positive projected disposable income was the postpetition surrender of a residence or other collateral and the resulting decrease in secured debt.

8

*In re Goble*, 401 B.R. 261, 277 (Bankr. S.D. Ohio 2009).

While the ability to fund a Chapter 13 Plan is of great significance in the totality of the circumstances analysis under § 707(b)(3)(B), it is not dispositive. *Witcher v. Witcher (In re Witcher)*, 702 F.3d 618, 623 (11th Cir. 2012); *In re Altman*, 2009 Bankr. LEXIS 4185, at *21 (finding the totality of the circumstances demonstrated abuse where debtor misrepresented his budget and testified to luxurious spending on recreational activities reasoning that even though the debtor claimed it was "modest," it should still be considered disposable income—"[a]mong the most important of these factors is the debtor's ability to fund a Chapter 13 plan."). Courts also consider whether the debtor enjoys a stable source of future income as it relates to the debtor's ability to fund a potential chapter 13 plan. *In re Carney*, No. 07-31690, 2007 Bankr. LEXIS 4100, at *30 (Bankr. N.D. Ohio Dec. 5, 2007) (considering the fact that the "[d]ebtors have stable, regular and historically rising income well above the state median" in ordering conversion to chapter 13). Also relevant is "[w]hether the bankruptcy filing was precipitated by an unforeseen calamity, such as sudden illness or unemployment." *In re Cribbs*, 387 B.R. at 335. Other relevant considerations include "whether the debtor's expenses could be reduced significantly without depriving them and their dependents of necessities." *Id*. Such reductions can include unnecessary spending on recreational activities. *See e.g. In re Altman*, 2009 Bankr. LEXIS 4185, at *21.

Debtor does not contend that he is entitled to application of the special circumstance exception to the Means Test calculation. Rather, the disputes between Debtor and the UST center on the secured debt deductions Debtor took on line 33d of the Means Test, the rent deduction taken on line 9c, and the additional deduction taken for internet and cell phone expenses on line 23. The UST argues that Debtor can claim the secured debt deduction for the marital residence for which Debtor was obligated until after the filing of this case but cannot also claim a monthly rent expense

9

even though Debtor was in fact paying rent. The UST argues that the additional expense for internet and phone is double dipping because these expenses are included in the IRS Standards for housing and utilities and have already been accounted for.

In response, Debtor argues that he is entitled to the debt deduction for the home because he was contractually obligated under the loan documents when he filed the case and is also entitled to the deduction for his actual housing cost limited by the applicable IRS Standards. With respect to the additional internet and cell phone expense Debtor argues that the nature of his work requires additional expense for reliable and fast connectivity. Thus, the first question the Court must answer is whether either the secured debt deduction for the marital residence or Debtor's rent deduction must be disallowed.

### III. Analysis

#### A. Section 707(b)(2)

As previously noted, the Means Test is a screening mechanism for chapter 7 cases to determine if a case is one in which the Court must presume abuse. Determining if a case is a presumed abuse is determined through an objective, mathematical formula established in § 707(b)(2). The deductions claimed are those existing as of the petition date. In considering an analogous issue, courts that use the snapshot approach hold that if the Debtor is contractually obligated on a debt as of the petition date, regardless of their stated intention to surrender the collateral, then the expense is appropriately included on the Means Test. *In re Rivers*, 466 B.R. at 569; *In re Walker*, 2006 Bankr. LEXIS 845, at *9-10 (in accordance with the plain language of the statute the court concluded that whether payments are "scheduled as contractually due" is not affected by surrender of collateral).

10

The Court has not located any authority that creates a bright-line rule that disallows a secured claim deduction for a mortgage or disallows a monthly rental payment as a housing expense when the debtor is contractually bound to the mortgage payment on the petition date and is living in an apartment and paying rent on the petition date. *See e.g., In re Sibila,* No. 09-64754, 2010 Bankr. LEXIS 3843, at *11 (Bankr. N.D. Ohio Oct. 28, 2010) (denying motion to dismiss where debtor claimed two residences, one of which the debtor bought on the eve of filing for relief because "[t]he Means Test is mechanical, not equitable, in nature."). The more common scenario is allowance of multiple residence deductions if the debtor's business and/or income requires that additional residence and in the context of a § 707(b)(3)(A), (B) analysis. *See e.g., In re Gutierrez*, 528 B.R. 1, 20 (Bankr. D. Vt. 2014) (keeping an additional rental apartment where debtor's job required extensive travel was not evidence of bad faith); *In re Goldberg*, No. 16-12975, 2017 Bankr. LEXIS 2005, at *21-23 (Bankr. N.D. Ohio July 20, 2017) (debtors were not subject to dismissal for bad faith or totality of the circumstances under § 707(b)(3) for keeping a residence and two business properties when UST could not show that net business income would increase by surrendering any of the properties or that surrender would yield a dividend to unsecured creditors in a chapter 13 case).

In this case, on the petition date, Debtor was legally obligated to, and intended to, deed his interest in the marital home to his former spouse in accordance with the divorce decree and settlement. Debtor's former spouse was obligated to remove Debtor from the mortgage obligation. Neither of these events had occurred by February 28, 2023, when this case was filed. Thus, Debtor was in fact contractually obligated on the mortgage and payments were contractually due even though he intended to deed his interest in the property to his ex-wife and be relieved of

11

the debt obligation[3]. Similarly, if Debtor had filed a Statement of Intention to surrender the home he would, as of the petition date, be contractually bound on the debt even though his intention was to relieve himself of the property and obligation through the chapter 7 case. There is not a meaningful difference in these situations. Furthermore, nothing in the language of § 707(b) provides for disallowance of a secured debt deduction on real property that is not the debtor's residence. Indeed, the Means Test form does not limit the secured debt payment section to mortgages on debtor's residence(s). Therefore, the Court concludes that the Debtor is entitled to deduct the contractually due mortgage obligation.

Line 9 of the Means Test provides a means of calculating the debtor's net mortgage or rental expense by taking the IRS Standards and subtracting the average monthly mortgage payment for all debts on the home. In Debtor's Means Test, at line 9a Housing and utilities Mortgage or rent expenses, Debtor claimed $1,132.[4] On line 9b, Total average monthly payment for all mortgages and other debts secured by your home, Debtor claimed $0 as he has no mortgage payments on his apartment. Finally in line 9c, Net mortgage or rent expense, Debtor claimed $1,132, because there was no mortgage payment to deduct. Debtor testified that he currently pays $2,300 in rent per month and that four years ago when he first rented the apartment, he currently occupies that the rent was $1,600. There is no dispute that the Debtor's primary residence is the apartment, that his rent is $2,300 per month, and that Debtor has no debts secured by the apartment. Thus, the Court concludes that Debtor filled out section 9 of the Means Test appropriately. Nothing in the language of § 707(b) provides for disallowance of a housing rental expense if the debtor is

---

[3] The UST states in the Motion that the secured debt deduction for the mortgage is $2,000. Debtor claimed this amount. Therefore, the Court construes the $2,000 amount as undisputed.

[4] This amount is based upon a 1-person household; if Debtor had claimed a 2-person household because of his bi-weekly custody of his son, the amount allowed is $1,511.

12

also taking a secured debt deduction for real property that is not his residence. Therefore, the rental expense will be allowed.

For the foregoing reasons, the Court concludes that inclusion of a rent expense (limited by the IRS Standards) and the mortgage debt contractually due at the petition date are both properly included in Debtor's Means Test.

Debtor also contends that his job requires a special cell phone and internet connectivity whose cost would surpass the IRS Standards. On Debtor's Schedule J, line 6c for "Telephone, cell phone, Internet, satellite, and cable services" Debtor claims an expense of $310. On Debtor's Means Test, Debtor reports an "Optional telephone and telephone services" expense of $50. During the evidentiary hearing, Mr. Slack testified that absent additional documentation that would warrant additional cell phone expenditures, the baseline IRS Standards must be applied. Debtor failed to remit any additional documentation that would prove a need for amounts in excess of the IRS Standards, therefore the additional expenditures must be excluded from the Means Test.

Making these adjustments to the UST's Means Test calculation, that is allowing $1,132 for rent and disallowing the additional $50 for telephone expense results in negative disposable income on Debtor's Means Test. As a result, the UST has failed to carry her burden of establishing that this case is presumptively abusive. This is not the end of the Court's inquiry, however. The next step in considering if a chapter 7 case is abusive is set forth under § 707(b)(3)(B) which provides for a totality of the circumstances analysis of a debtor's income and expenses and whether under this more fulsome approach the case is an abuse of the chapter 7 provisions of the Code. 11 U.S.C. § 707(b)(3). Because the presumption of abuse does not arise under § 707(b)(2), the burden is on the UST to prove that the filing is abusive and should be dismissed or Debtor allowed to convert the case to chapter 13. *See In re Walker,* 383 B.R. at 836.

13

**B. Section 707(b)(3)**

When, as here, the presumption of abuse does not arise or has been rebutted, the Court must consider whether the debtor's filing is abusive based on bad faith or the "totality of the circumstances." 11 U.S.C. § 707(b)(3)(A), (B). Here, there is no allegation of, nor indication of, bad faith, thus there is no basis to dismiss under the first prong of § 707(b)(3). *See In re Walker,* 383 B.R. 830, 837 (noting that bad faith under § 707(b)(3)(A) and totality of the circumstances under § 707(b)(3)(B) are separate grounds for finding abuse and bad faith is no longer a factor to consider under the totality of the circumstances).

Turning to the second prong of § 707(b)(3), it "does not define 'totality of the circumstances,' and bankruptcy courts have considerable discretion in determining whether dismissal for abuse is appropriate under this provision." *In re Kulakowski*, 735 F.3d 1296, 1298-99 (11th Cir. 2013). In considering the totality of the circumstances, courts consider the debtor's ability to repay his debts by looking at his actual income and expenses and by other factors surrounding the filing of the case. *Turner v. Watson (In re Watson)*, No. 06-72831, 2007 Bankr. LEXIS 3777, at *6 (Bankr. N.D. Ga. Oct. 3, 2007) (Mullins, J.). In making this analysis, a court must look at what the debtor is *actually* paying rather than the more hypothetical Means Test. *Id.*

Debtor truthfully completed the Means Test, schedules and statement of financial affairs and cooperated with the UST in providing documents in response to her inquiry. Further, Debtor's filing was precipitated by the legal fees associated with a costly divorce. The long-fought divorce undoubtedly satisfies the calamitous event factor identified by the court in *Cribbs*. 387 B.R. at 335. However, the divorce is now finalized, and the concomitant legal fees are no longer accruing. As a result, this factor is neutral or at most weighs slightly in favor of Debtor under the totality of the circumstances.

14

Debtor has been employed by the same company since at least 2019 and in 2022 earned an annual income of $142,486.27. Debtor also generally expects to receive a yearly raise of approximately three percent (3%). Debtor's income is well above the median income in Georgia for a family of 1 or 2, and Debtor enjoys the stability of an income that could pay off most, if not all, of his creditors in a chapter 13 plan. This factor, the ability to fund repayment to creditors, is the most important factor under the totality of the circumstances analysis and Debtor's income and current financial situation unquestionably allow for funding of a chapter 13 plan with some amount of repayment to creditors. As a result, the Court concludes that Debtor's filing is an abuse of the provisions of chapter 7 under the totality of the circumstances analysis and Debtor may convert this case to Chapter 13 or the Court will dismiss the case as an abusive filing.

**IV. Conclusion**

In applying the Means Test, a mechanical and objective test, the Court concludes that because Debtor had obligations that were contractually due on the mortgage, he was renting an apartment in which he lived, and the Code does not prohibit taking both deductions that the UST has failed to establish that this case is presumptively abusive. As a result, the Court will deny the UST's Motion under 11 U.S.C.§ 707(b)(1) and (b)(2).

In contrast, under the totality of the circumstances analysis of 11 U.S.C. § 707(b)(3)(B), because the expenses of divorce have stopped accruing and Debtor has significant income to fund a chapter 13 plan the Court will grant the UST's motion under § 707(b)(1) and (b)(3)(B). It is therefore,

ORDERED that this case is not presumptively abusive under 11 U.S.C.§ 707(b)(2) and the Motion is DENIED to that extent; it is further,

ORDERED that this case is not an abuse of the provisions of chapter 7 of the Code under 11 U.S.C.§ 707(b)(3)(A) and the Motion will be DENIED to that extent; It is further,

ORDERED that Debtor has significant income to fund a chapter 13 plan such that granting relief would be an abuse of the provisions of chapter 7 and the Motion is GRANTED under the totality of the circumstances under 11 U.S.C.§ 707(b)(3)(B). It is further,

ORDERED that the Court will give Debtor 14 days to file a motion to convert to chapter 13. If Debtor does not convert this case within that time, the case will be dismissed without further notice or hearing.

**END OF ORDER**

**Distribution List**

Bryan Michael Wlodar
3104 Madison
Atlanta, GA 30346

Robert W. Schwartz
P.O. Box 160100
Atlanta, GA 30316

Lindsay P. S. Kolba
Office of the U.S. Trustee
Suite 362
75 Ted Turner Drive, S.W.
Atlanta, GA 30303

ALL PARTIES AND CREDITORS.